And that is Brenda Mason v. Lafayette City Parish Consolidated Government. And we'll hear from you, Mr. Spear, representing Brenda Mason. Thank you, Your Honor. Jeff Spear on behalf of Brenda and Billy Mason, the parents of Quemain Mason, who was killed in this shooting. Your Honor, although this case comes to this court as an appeal from a motion for summary judgment dealing with qualified immunity and the use of excess force, and there is much case law dealing with testimony and evidence about in the moment of the particular shooting, the court will indulge me that the court has the family of the young man that was shot here today. And I believe that everything in this case bears on the fact that this particular individual who lost his life was, albeit in hindsight, a 21-year-old college student majoring in criminology whose only aspiration in life was to become a police officer, who exited his girlfriend's apartment door and was as shocked as the police were to come into contact with them. Upon being confronted by the police and subscribing to the case the Fifth Circuit recently rendered in Luna v. Mullinex and acknowledging that a gunshot is a violation of the Fourth Amendment right that the court should consider, right away at that spot is where genuine issues of material fact begin to arise. This young man, with aspirations to be a police officer, who had applied for the very force that killed him three days before this shooting took place, stood with his hands up according to two of the police officers and his girlfriend. In the course of a span of two to four seconds, depending upon who you listen to at the time of this confrontation, the lead police officer in this pack, the defendant, shooter, police officer Martin Falk, who had a canine officer and a gun at the same time, which is a violation of their own policy, led the crew... Okay, did this young man you're referring to have a pistol on himself? He did, Your Honor. Where was the pistol located? He was carrying it legally exposed in his waistband and for the courts... And the police saw that, or did they? Yes, sir. Yes, sir. The lead officer... Whenever you see somebody, you're confronting somebody with a gun, that is heightened alert. Yes, sir. Okay. What information did the officer have when he arrived, when he was standing there and first confronting him, what information was he acting on according to the record? I'm sorry, Your Honor, I didn't hear. What information did that officer with the dog have about this young man when he turned that dog leg toward him? Therein lies yet another dispute, Your Honor. At the time that the police officer rounded the corner and met this young man, there has been argument among counsel that the police officer heard a 911 dispatch where there was yelling and conflict and allegations about a gun, whereas the sworn statement of the police officer in question stated that he paid no attention whatsoever to the dispatch and that he disregarded two witnesses who met him at the scene, didn't listen to anything they had to say, didn't ask him anything. Police at the scene at the time that the officer who shot the individual arrived? The two witnesses, Your Honor, were in the parking lot when the police officer arrived. Was he the only police officer there? No, sir. There was two more arrived with him or simultaneously. He was the first on the scene. The first one, as I understand it, was the police officer with the dog, Officer Martin Fall, and contemporaneous with him came in two more police officers, Officer Brittany Dugas and Jace Gallant. Those three. The officer with the dog, was he first on the scene or did he come later? He took the lead with the dog and instructed the other officers to get behind him. He approached the apartment in question down what was estimated to be a 30-foot breezeway and made an immediate right to the apartment in question, which is an open gallery in this complex, by the way, standing no more than 10 feet from the door and was shocked and used an expletive to say he was shocked at running directly into the person he understood to be the suspect, who was, in this case, Kwame Mason and his girlfriend, Raquel Babino, who had just left the apartment to look for a dog. Upon being confronted by the police, Ms. Babino, however she pronounces it, and Mr. Mason both raised their hands immediately. Ms. Babino testified that she looked at her boyfriend as he stood there in shock, as she was, and realized that the police may overreact to this young man who has an exposed weapon on him, and she jumped in front of him and began to yell, please don't do anything, stop, stop, stop, he's not doing anything wrong, he has a license for this gun, he's training to be a police officer, all of which was true, and in response, the lead police officer with the gun and the dog and the gun out at the same time. This is a German Shepherd police dog, or what is it? It's a large German Shepherd, Your Honor, and he's kept on a three-inch lead. At the time of the confrontation, according to all the parties, they were no more than three feet apart. Ms. Babino says that young Mr. Mason had a look of shock on his face, and his hands were clearly up and he was standing still as she was yelling, please don't do anything, he's not doing anything wrong. You said she jumped in front of him, so she was standing between him and the police officers at this time? According to her testimony, she attempted to get in front of him so that nothing would happen to him because she was afraid that something would happen to him. The police testimony was that she ran all around the scene, including behind some of the police officers, but we don't believe that is correct, and in fact the evidence will show otherwise, because when Mr. Mason ran away, it's a factual dispute, and that's the issue. Yes, there's a factual dispute, and there's blood all over her dress because she was standing next to the young man when he was shot. The look of shock on Mr. Mason's face was interpreted by the lead police officer with the gun and the dog as being what he described as a post-academy instructor, with the intuitive skills trained into him as being this weird look where he referred to, you know how them, how they tuck their chin in for a boxing stance, and he actually, the gentleman with the dog, defendant at fault, said, I was going to put up my gun and fight him. Not explaining what he would do with his dog or anything of the sort, but in this course of the two to four seconds, he's formulating this opinion that this young man wants to fist fight him, and he's going to put up his gun and engage in a fist fight. At what point did the policeman see the gun that the deceased had? It was just following that, Your Honor. The police officer says he saw the weird look on his face, he saw him tuck his chin, he saw Quaman Mason use his girlfriend in what he characterized as a slick kind of way to shield himself from the other police officers while squaring off. Somebody scream, gun, gun, or anything like that? At that point, the officer with the dog, after he said, Mr. Mason used the girlfriend to shield himself from the other officers, and squared himself off to the officer with the gun, at that point, the officer with the dog said, gun, gun, and he released his canine to attack Quaman Mason. At that point, in all of this, the other two police officers, J. Scalon, Brittany Dugard, clearly testified that Mr. Mason was standing there with his hands up. But his hands came down. According to Officer Fall. Which would have been natural enough, the dog was attacking him, right? Exactly, Your Honor. You took the next words right out of my mouth. The dog attacked, and in fact, one of the police officers, I believe it was Officer Gulan, if not Dugard as well, both said that his left arm remained up, but as the dog attacked, his right arm came down, which would be natural to protect himself. The autopsies performed, and there were two on this young man, said that he was shot with his left hand in the air. Although the wounds were similar to the right side, neither of the pathologists would make that particular statement about whether or not the right arm was in the air at the same time. However, according to Defendant Fall, he released that dog on a three-inch lead and began firing simultaneously with the dog striking Quaman Mason. According to the Defendant Fall, he said the dog failed to disarm him. I don't know how that's supposed to happen, but the dog failed to disarm him immediately, so he began to shoot. The first shot struck Mr. Mason, who, by the way, another question of fact, we believe, is Quaman Mason stood six feet tall. The officer was 5'4", 5'5". The wound that struck Mr. Mason- Was it a male or a female officer? It was a male. The wound that struck Mr. Mason in the chin broke his jaw, ricocheted downward, and entered the torso, but it was clearly at a downward angle. After the first shot, Officer Fall continued to fire with each of the six consecutive following rounds, striking Mr. Mason in the back. The last two rounds were fired into this young man clearly after he could have not possibly posed any threat whatsoever and was laying on the ground. Did anybody, did you have any opinion from any expert or otherwise on whether, at what point the deceased actually died or was so debilitated that he could not move himself? We did, Your Honor. And what did that show? Dr. James Traylor, who was the defendant's expert from North Louisiana, testified that Mr. Mason was completely debilitated when he hit the ground. Basically, the humerus bone on both arms had been shattered by gunfire. At no point- At the time he hit the ground. At the time he hit the ground, yes, sir. He could not have raised his arms. He could not have held a gun in his arms. He could not have committed- Was there any evidence that the police officer knew where the bullets had landed that he had fired? Other than Officer Fall testifying that he intentionally placed each round forward enough from his dog's nose not to strike his dog, with each of the six consecutive rounds that struck him in the back being on his back left side,  I want to answer your question, the last part of it. Dr. Traylor also testified that this young man continued to live for up to five minutes after he hit the ground. He was drugged by his feet from this scene by the police officers, where alleged CPR conduct was performed not by the man who shot him, he walked away and had a cigarette, but by other police officers who drug him away at the scene, and eventually some 14 minutes later a Cadian ambulance was allowed to come there, which forms a basis of the claim as well. What was the racial makeup of the officers and the victim? Sir? What's the race of the officers and the victim? The race of the officer was a young white man, Cajun male. The deceased? Young black man. Wait a minute, a white Cajun male? Yes, so they looked a little different to me. What am I supposed to, what is that supposed to be conveying to me? What sort of characteristic is that? Nothing, never you got it. He was a short fellow. And what about the other two officers? The other two officers were a white young lady and a middle-sized white man. This, probably more important than the race, I would think, is the fact, this call came at a campus apartment. This was clearly students that they were responding to, and if they paid any attention to the 911 call, it referenced a dog. It was a dispute about a dog. This man jumped out of his. Wasn't there a lot of hollering and screaming? Is that disputed as well? There was a lot of hollering and screaming, and there has been arguments. Was there a lot of violent talk, I mean about guns and all of that, as has been alleged? There was a volatile conversation between boyfriends, competing boyfriends of this young lady. The other ones had left the scene by the time this all transpired, and Mr. Mason was not angry or anything of the sort. In fact, there was testimony that before he left the apartment and was confronted by the police, he was given a bottle of water, had it, and then joked with the girlfriends in the apartment that, I guess they drank my beer too, and they all had a good laugh. He was not angry. He was not boiling. He was not upset. He walked outside and was shocked literally to death. He walked outside? He walked outside to go look for his girlfriend's dog, and that's when he was confronted by the police. In this particular case, Your Honor, as I was referencing, after the first shot, all of the remaining shots struck this young man on the back left-hand side. He hit the ground, and then after all threat was stopped, this officer walked around him, and in his statement, this officer said he continued to shoot him because he continued to move. He was alive. He did not base his standard on whether or not he was a threat. All right. Now, that is one of the issues that occurred to me. I mean, it seems to me that the weaker of the cases, of the two incidents, is the initial gunshot. But then when he shot him when he was down, it jumps into another category. Do you see it that way, or is it just one episode? Absolutely I see it that way, Your Honor. After he hit the ground, regardless of what they said beforehand, it clearly was not a threat as he hit the ground. And, in fact, there was two more incidents after that because this particular shooter not only clearly did not have any form of threat, but he took different positions when he shot this young man. What did he say? What does the police officer, or how does he justify shooting a man on the ground who has been already shot five times? One thing he said, Your Honor, is, and if you'll excuse me for using the profanity, but trying to quote him correctly, he said, Oh, shit, he's still alive. And he shot him again from above his head, a wound which their witness said went through his arm and entered his torso. Then he walked around to the feet of the young man, saw him move again, and shot him yet again from a different angle, and then testified that had he moved again, I was waiting to put the third round in his head. What is the evidence that relates to the gun that the deceased had? Was it ever removed from his waistband? The testimony of this particular police officer that did the shooting was that he saw the gun, saw him grab the gun, and then at the end of the statement he gave to the state police, when he thought the tape was off and the court has the video, he actually leaned over to the state trooper and said, So did he really have a gun? What hand was it in? Who got the gun? Was it that? The police officer that shot him? Yes, sir. He stopped at the end of the shooting, and the state trooper said, Well, c'est tout fini. We're done with the statement and turned off the tape. And the defendant police officer who did the shooting, who thought the recorder was off, said, So did he have a gun? Which hand was it in? All right. But my statement to you specifically, though, is where was the gun located by the police after the incident was over? After it was all over with, the testimony was that a separate police officer who arrived on the scene rolled this young man over and removed it from his belt. So it was where it was at the beginning? Where it was in the beginning. This young man never posed a threat to anyone, Your Honor. Okay. We'll move on to the next. Mr. Wilkes, we'll hear from you. Good morning, Your Honors. And I please the Court, John Wilkes on behalf of Lafayette City Parish Government, Officer Martin Fall, and the Chief. Just for the sake of housekeeping and because of some of the things that were mentioned in the briefs and oral argument, I was informed by the clerk that the 911 call and dispatch and the autopsy photographs, the radio traffic that took place during this call, the Louisiana State Police report, with all of these people's statements that the attorney referred to, Mr. Speier, are, I don't believe, have been requested by the Court, according to Ms. Nancy Lundy. So I would ask that if the Court has not reviewed those, that the Court please do. What do you say about the observation that Counsel Offset made that after his statement was over, the police officer who shot the man, describing the gun, that the gun was in his hand, turned and says, Was there really a gun involved in this? What happened? That's not what was said in the statement. Okay. What was said? In the statement, the officer, Officer Fall, clearly talks about the fact that he saw the gun during the incident. Yeah, but then he says when the tape was turned off that he made this incriminating statement. Did he or did he not? If you listen to the tape, Your Honor, the answer is no. There was nothing that said that the tape went off. Where does he get this then? I have no idea where he gets this. But I would ask that you please review the tape in all those regards, because certainly that is not the case. Okay. And especially with regard to what went on before this, there were some questions about that. Kwame's family take the position that although there is zero evidence that Kwame Mason committed any crime, whether an aggravated assault or the failure to alert a police officer that he owned a weapon during the approximately four seconds which he lived between the time that he was confronted by the police and shot dead by Officer Fall, the reality is there is nothing in the record whatsoever that can support a finding that Kwame Mason was guilty of any crime whatsoever and certainly no threats to lives or safety by Kwame Mason which would justify his brutal slaying. If you listen to those 911 tapes and you take it as a fact what those dispatch logs say, this happened between 21-22 and 21-27. Five minutes from the time of the call to the time the shot's fired. That doesn't count for Officer Fall's travel time. It doesn't count for him getting his dog out. It doesn't count for him doing what he is required to do and that is you police officers stop. He was the ranking officer. There were two corporals. He was a canine officer. In a call such as this which was a 64 gulf, in the briefs there's a mistake, 65 gulf. 64 gulf means aggravated assault or aggravated robbery with a gun. Martin Fall knew that before he got there. Every officer testified that they knew that before. They had an excellent description. But he did say he didn't pay attention to the dispatcher. He didn't say he didn't pay attention to the description. He talks about the description in his statement. As a matter of fact, he says that when I rounded the corner. I thought there was a statement in the briefs that he said, I didn't pay any attention to the dispatcher. I think he made that statement about one aspect of the case, but not about what the description of Kwame Mason was as he was driving to the scene. Or what the surrounding circumstances were. Correct. And when they rounded the last corner, if you go from Judge Higginbotham's right shoulder to Judge Owen's left shoulder, and the width of where your seats sit, that's the space that three officers, a dog, Ms. Rubino, and Kwame Mason all met. When they rounded the corner, that's who everybody was faced with. All the policemen had their pistols out, and Mr. Mason and Ms. Rubino were standing there. Now, police officers all had their weapons drawn, and the deceased obviously never threw his weapon. So they already had their guns drawn and were in a position to fire at him had he made any move toward his gun themselves. But none did. Not only did none make a move to shoot him at that point, even though they knew he was African American, they knew the length of his hair, they knew the clothes, top and bottom, that he had on, that he was probably with a female. They didn't know exactly whether he was inside or outside the apartment. But when they rounded that corner, there was no doubt in any of them's mind, according to their statements, this is our man. They had their guns out, and they didn't shoot. Although, when you read this statement— What you then have is a man standing there, and assertively he had his hands out, and three officers had their guns out, leveled at him, and at that juncture he then ordered the dog on the man? No, the dog was not put in action. But the dog, at the time that the dog was released, were the accompanying officers present with their guns drawn? Yes, but the dog was not released. The dog never left the leash of Officer Fall's left hand. But he turned the dog on him. He let the dog go once he saw the gun. Once Kwame Mason was known to have a gun, Officer Fall yelled, Gun! Gun! And he let the dog go. Now, Mr. Mason's hands and her hands, Ms. Babineaux's? Yes, they were in the air. She dropped hers and started causing a racket. That's what these statements that I'm asking you to listen to say. They're video. The actual officers testifying. Kwame had one hand up, but one hand down. And he came up toward the pistol and cupped his hand. And it was when that occurred that the officer yelled, Gun! Gun! Let go of the dog. He hadn't moved his arm. Did the officer say in the statement that he made, immediately following that, that he saw him raise his hand up toward the gun? I didn't know that the officer, any time really lapsed between the time that he saw the gun in his waistband and he turned it loose. But now you're saying that he saw the gun in his waistband and then he saw him move his hand before he turned the dog loose. He had the dog at bay. He then saw Kwame move his hand down, at least his right hand. He also canted and turned toward the officer. At some point, Officer Falls saw the gun, and Kwame's hand was now over it. He then let loose of the dog and, according to the officer, almost simultaneously started shooting because the suspect's hand was at the pistol. So what you're saying is that they, well, you're obviously saying that he put his hand down before the dog charged. There's absolutely no doubt about it. Why can you say that? Because, I mean, I sure heard statements to the contrary this morning. Because two police officers, Brittany Dugod, the female officer who was present, with Jace Galland. Brittany Dugod, by the way, is African-American, not white, as Mr. Spear indicated. And she also said that if Ms. Rubino hadn't have been in front of her, she would have shot Kwame Mason, as did Mr. Galland. Once they heard the word gun, and especially when Brittany saw his hand come up, Jace Galland, would you have heard Brittany Mason? Now, wait a minute. Hey, the court's over here. Not, no, no, no, no, no. Okay, I understand what you're saying. Two officers saw a hand. What was the, there was contrary testimony, wasn't there, that disputed that? Ms. Babineaux said in her statement, if you listen to it, she sits there that night, less than two and a half hours after this happened. Without a tear in her eye, unconfused, not upset at all, she says, he reached for the gun. Who said that? His girlfriend, categorically. And then the next day, a gentleman took her to the TV station, and she started telling a story about, well, he reached for the gun because he'd been in criminal justice, and he knew the best thing to do was to take the gun out and to put the gun down. No officer said, put the gun down. They said, put your hands up, show us your hands, get on the ground. We're at summary judgment here. We're not the jury. We just, we have to accept they're the facts in the light most favorable to Mr. Mason's family. Yeah, but there has to be evidence of it. In other words, we need more than lawyer statements. I thought this was the witness statement that said. The witness statements that I referred to earlier that were not manually attached and were not electronically attached to this record are contained in document number 37. And if this court wants to find out who to believe here today . . . We can't do that. Sir? You described it as a jury case. Well, if you look at this case . . . I understand. Somebody's got to sort that out, and it's very difficult to go through this and who said what at what and do it on paper. Qualified immunity is there, but the qualified immunity depends upon the resolution of facts. What I would like . . . It seems . . . I've heard a lot of lawyer testimony here this morning. I want to know what the witnesses said. And were there any witnesses that contradicts what your police witnesses and Ms. Ravenoff said about his reaching for the gun? Does he have any witnesses that say he never reached for his gun? Because he says his hands were all up like this. He didn't reach for his gun until the dog attacked him. Not one. Not one witness says that. Not one. And Judge Richard Hyde said the same thing. Okay. So he got three shots in him before he got his hand on his gun. Although he moved first for his gun, he never got there. He never got there. He got to it. He just never got it out. How do we know that? He got to it. Because the statements . . . When you rolled him over, the gun was still tucked in his . . . That's right. That's what I mean, Judge. He never got to it. He pulled it out. He didn't aim it at a policeman. Well, we know he didn't draw it, whether . . . Correct. So you're arguing about whether his hand movement was responsive to the dog or responsive to the . . . You know, if you bring a German shepherd of that type, snarling as the dog likely was, and you're a young male . . . If you think your hand's not going to go down, I'm sorry, but that's just in human nature. Judge, I'm just trying to stick to the facts. That's why . . . I understand that, but . . . But you're telling us that, from what Judge Higginbotham described, that there is no witness that supports what he said, and that is that the dog was released before his hand went down. Simultaneously, a dog . . . No. What did his girlfriend say about . . . The dog was not released before his hand was down. The dog was released at the same time the hand movement of Kwame Mason was at or over the pistol in his waistband, and the shots were fired at the same time the dog was moved toward him, not let go, and that's how the shooting occurred, and the shooting continued to occur. What did his girlfriend say about the timing of the reaching down towards the pistol and letting the dog move forward? Well, she categorically said he reached for it, and that if you look at her statement, she says he was reaching for it because he knew he needed to put it down. Now, if I'm Kwame . . . Now, I'm just . . . What does . . . We don't need you to . . . We can't accept your speculation, and we can't accept your speculation in favor of the police officers. What we need to hear is what she said and how that fits in with when the dog attacked and when the shots were fired. Well, I'm assuming that the shots weren't fired . . . You can't assume. What did she say? She said he was reaching for the gun because he knew he needed to put it down. By definition . . . And then what happened? Without assumption. He has to be not being shot right then. But the officer is standing with a dog, I guess, in his left hand, if he's a right-handed officer, and he's got the gun . . . he's got the dog, and he's got his gun in his right hand, and so when he shoots the fellow, he is inches from him when he's shooting him. Is that correct? In the first shot . . . It's just shooting straight into him. The shot goes into his chin, so he was . . . And he hit, but he shot one shoulder, then the other shoulder, and then he goes down. Yes. Now, so he knew when he was standing there, when the gun went down, he'd shot him in both shoulders. I'm just saying this is what the evidence describes. Then he's on the ground, and then he goes forward and continues to shoot him. Okay, well, that's not what he said. I thought the first shot went into his chin in a downward motion. That's correct. And that the police officer was 5'4", and the decedent was 6'1". Yes. So to be a downward motion, somebody sounded like the decedent was moving downward. Even Mr. Spear told you that in Mr. Mason's testimony on video, which you can review, he said that he tucked his chin down, and it was as if he was going to take a fighting stance. So I went to put my service revolver up because I thought he was going to fight me, and then the other things ensued. What other things? He didn't rush the officer, and one arm apparently stayed up. The other arm went down by the pistol, and the officer deployed non-deadly force, the dog and deadly force at the same time. And he's standing at what, two feet from him? Three feet? Three feet. What did the girl do? The dog bit his stomach. What did the girlfriend say about the timing of all this? The dog bit my stomach? The dog actually bit this side of Kwame's stomach. This side. This side. Autopsy photograph. Not down here. Well, he bit him. Ma'am, I'm sorry. What did the girlfriend say about the sequence of events? She said that she looked over to her boyfriend, who was then to her left, and he moved his hand down toward where his gun was. And she clearly says it. And she says the officer started firing. And then the next day, she's coming up with a theory as to why. The policeman has, he doesn't have to know the motive of why Kwame put his hands down or that. He doesn't have to know that. If the man goes for the gun, that's it. He is employing deadly force. And a dog is not deadly force. And you may, that's a strong point. But what do you say about the fact that he shot him twice after he was down? Both of his arms were broken. And you said a while ago, the court's over here, so I'm not going to move. But I can get on that floor just jolly, and I promise you I can do what Officer Mason really said, and that is he attempted to roll up. Okay? He was face down, remember? And he attempted to roll up, and the gun was right here, and his hand was still underneath him. So he shot him two more until he stopped. And that's what he's trained to do. Because this court recognizes. What testimony do you have other than the officer who shot him that said that he turned over in that threatening way? Anybody? I believe Brittany Dugas, the African-American policeman who would have shot Kwame. Said the same thing? Did she say she would have shot him when he was down? No. No. She was busy dealing with Ms. Babineau. Okay. All right. Thank you. We'll have her bubble. Thank you, sir. Mr. Speier. Thank you, Your Honor. If I made a mistake and Officer Brittany Dugas is not a white girl, that's my mistake. I saw a video of her. She does not look African-American. She looks white. However, insofar as the statement made by this police officer after his interview was turned off, this gentleman said, and we transcribed it, and his name was? Okay. He says it didn't happen. You said it did. Yes, sir. The only way we'll know it is to look for it ourselves. So move on to the next point. Okay. Next point. Ms. Babineau, the girlfriend, what did she say? Ms. Babineau is being drugged from the scene of the shooting within moments of the time it occurred with blood all over her clothes by Officer Brittany Dugas when in the dash cam video of Officer Ron Clark, she can be seen being drugged by, and Ms. Babineau is literally yelling, why did they shoot him? Why did they shoot him? And Dugas said something to the effect, oh, he shouldn't have reached for a gun, and Ms. Babineau, her first statement of the night was he didn't reach for anything. He didn't have a gun. Y'all didn't have any reason to shoot him. Well, she said he didn't have a gun, but we know he did. Well, she said he didn't reach for the gun. He didn't have it in his hand. He didn't try to shoot. She said he didn't have a gun. If I did, I meant to say he didn't reach for it. He didn't have the gun out in his hand. She said he was not posing a threat. This young lady was taken to the police station later that evening and kept there until 430 in the morning, not before which she had to be taken to the emergency room for treatment. Unlike the police who was given two sleep cycles before they give a statement, she was kept there until 430 in the morning and was visibly shaken. She stammers terribly in the audio statement, and she testified in this case and gave a deposition. When did she give the statement? Was it early or after she had become married, as you say? The statement that she gave to the police was an audio statement, and it was at about 3 or 4 o'clock in the morning. How long had she been there then? She had been there all night since the time of the shooting. They brought her from the emergency room, and then they finished her statement. Of particular interest in that point is that all these witnesses were videoed and audioed. Has she been examined to explain this alleged inconsistency between what she told the police and what she told the television station the next day? Yes, Your Honor. What did she say? She said that Quamaine Mason never reached for a gun, never presented a threat. Does she explain why she said he did? She said that she did not recall having told the police that and was shocked to hear it on an audio. And the point I was getting to, this is miraculously the one witness that we don't have an audio and a video of. Every other witness in this case, we get an audio, a video, and a transcript. Yet this young lady coming back from the hospital who's kept there all night suddenly doesn't get a video because the state police told us they forgot to press record. You say she'd been to the hospital before she gave this statement. What kind of injuries did she suffer? It was a mental trauma. She was in shock. She had blood all over her and she was thoroughly traumatized, Your Honor. She was brought back to her house at 430 in the morning where she was confronted with a scene that had been bleached clean. And thereafter gave her deposition where she said this young man presented no threat whatsoever. And her entire effort was to get the police not to shoot him because he wasn't doing anything wrong. And he stood there with a look of shock on his face the entire time. And as we pointed out in the brief, in the confined space that Mr. Wilkes is talking about, we've got three police officers with drawn firearms. We've got a dog. We've got this gentleman with his hands up. We've got a yelling girlfriend. And we have each of the police yelling conflicting commands. There is literally nothing this young man could do to avoid being hurt or shot or both or killed as this case came out. He's being told to keep his hands up and get on the ground. Being told stand still, get your hands up, keep on the ground. If he doesn't get on the ground, he gets a dog on him. If a dog comes on him and he drops his hands, then as Mr. Wilkes says, oh, it's in the sphere of a gun and he starts getting shot. Incredibly by the same police officer who released the dog. Neither of the other two police officers fired a shot. And regardless of what counsel said, both of those police officers said they did not see a gun on this gentleman. Not to the state police. Yes, but he also says that Officer Rabineau said that if the, not Rabineau, but the, Rabineau was the girlfriend. But the police officer said if she had not been in the way, she would have shot him. That was a later reenactment video done by the police officers. Both of which contradicted their original statements and if taken in a light most favorable to even the defense, were physically impossible wounds that could have been fired by this police officer. I hope the one thing the court takes away is the number of genuine issues of material fact. Well, I'll say that you created them here. Whether the record supports you or not, we'll have to determine. Thank you. The arguments that should have created them.